Cite as 2022 Ark. App. 77

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-21-50

|  |  |  |
|---|---|---|
| | | Opinion Delivered February 16, 2022 |
| CHRISTOPHER AKERS | | |
| | APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. 66FCV-18-1282] |
| V. | | |
| | | |
| K-MAC ENTERPRISES, INC., D/B/A TACO BELL | | HONORABLE R. GUNNER DELAY, JUDGE |
| | APPELLEE | |
| | | REVERSED AND REMANDED |

**KENNETH S. HIXSON, Judge**

Appellant Christopher Akers brought a negligence claim against appellee K-MAC Enterprises, Inc., d/b/a Taco Bell (K-MAC), after Akers was struck in the head by the front cover of a self-service ice dispenser that had become dislodged while Akers was filling his cup with ice. The trial court entered summary judgment in favor of K-MAC, concluding that there was no competent evidence that K-MAC knew or should have known about the defective condition of the front cover. Akers now appeals, arguing that the trial court erred in granting summary judgment and further erred in failing to consider an engineer's opinion that would have precluded summary judgment. We agree that the trial court erred in granting summary judgment, and we reverse and remand.

I. *Facts and Procedural History*

On February 28, 2016, Akers went to a Taco Bell restaurant in Fort Smith and purchased food and a drink. Drinks at Taco Bell are provided through a self-service beverage dispenser that includes an ice dispenser situated above the beverage dispenser. As Akers was filling his cup with ice, the front metal cover of the ice machine fell and struck him in the head causing certain physical injuries.

The Taco Bell restaurant is owned by K-MAC. K-MAC hired Jim's Refrigeration, Inc. (Jim's), to maintain and service the ice machine.[1] Jim's conducts annual preventative maintenance on the ice machine, which consists primarily of cleaning the water system, and makes repairs as requested by K-MAC.

On February 12, 2019, Akers filed an amended complaint against K-MAC and Jim's.[2] Pertinent to this appeal, Akers alleged that K-MAC failed to use ordinary care to maintain its premises in a reasonably safe condition. More specifically, Akers claimed that K-MAC was negligent in that it knew or should have known that the front cover of the ice machine was loose and presented a dangerous condition. K-MAC filed an answer, denying any negligence or liability.

---

[1]The ice machine was designed and manufactured by The Manitowoc Company, Inc. (Manitowoc). Akers' lawsuit included claims against Manitowoc but his claims against Manitowoc were later dismissed without prejudice.

[2]Akers' original complaint had named only K-MAC as a defendant.

Both K-MAC and Jim's filed motions for summary judgment. The trial court ultimately granted K-MAC's summary-judgment motion and denied Jim's summary-judgment motion.[3]

Before addressing K-MAC's summary-judgment motion, we set forth the following pertinent undisputed facts. The front cover of the ice machine at issue is secured to the ice machine at three points. There are two interior upper pins (upper mounting pins) affixed to the body of the ice machine that insert into pear-shaped mounting holes on the left and right side of the front cover at the top. There is a single exterior lower attachment screw at the bottom. The upper mounting pins are essentially bolts affixed to the interior of the ice machine by nuts. When the front cover is in place, the upper mounting pins are not visible. The upper mounting pins prevent the front cover from falling forward without being lifted upward. A single exterior lower attachment screw is inserted through the exterior at the bottom of the front cover and threaded into the ice machine to prevent the front cover from lifting upward and falling off the interior pins.

After the accident involving Akers, K-MAC called Jim's to come to the restaurant and reattach the cover to the ice machine. A.J. Stith, the owner of Jim's, came later that day to perform the repair. Stith observed that the left interior mounting pin and the exterior lower attachment screw were missing and that the right interior mounting pin was loose. Stith looked inside and outside the ice machine for the missing left mounting pin and the exterior

[3]As will be explained, *infra*, we have jurisdiction of this appeal pursuant to a Rule 54(b) certificate executed by the trial court.

3

screw but could not locate either. Stith then replaced the missing left mounting pin, tightened the loose right mounting pin, put the front cover back on, and inserted a new exterior lower attachment screw.

In K-MAC's summary-judgment motion, it argued that it was entitled to summary judgment because it did not have actual or constructive notice of the defect that caused Akers' injury. In support of its motion, K-MAC relied on the affidavit and deposition of Robert Tanner, who is a manager for K-MAC. K-MAC also relied on the depositions of A.J. Stith and Christopher Akers.

Robert Tanner stated that he oversees seven Taco Bell restaurants, including the restaurant at issue, monitoring the day-to-day operations. Tanner indicated that he is not familiar with the mechanics of the ice machine or the cover and that K-MAC employees are not permitted to work on or maintain the ice machine. K-MAC's vendor for equipment maintenance is Jim's. Jim's conducts annual preventative maintenance on the ice machine, which consists primarily of cleaning the water system, and makes repairs as requested by K-MAC. The last time Jim's serviced the ice machine prior to the February 28, 2016 accident was in July 2015 at which time no issue with the cover was reported.

Tanner testified that K-MAC employees visually inspect the dining room, including fixtures and equipment, for apparent defects throughout their shifts. These inspections involve looking for things like debris or liquid on the floor, broken chairs or tables, and apparent issues with equipment such as the beverage dispenser and ice machine. Employees working the cash register are trained to watch the dining room for potential defects while

4

standing at the front food-service counter and are required to walk through the dining room approximately every thirty minutes, or as time permits, to perform a visual inspection. K-MAC performs a food-safety-checklist inspection twice a day at approximately 11:00 a.m. and 5:00 p.m., which includes visual inspection of the dining room for apparent defects. Moreover, a manager walk is performed approximately every thirty minutes, which includes a visual inspection of the dining room, including the beverage-dispenser station, for apparent defects. Tanner maintained that prior to the accident involving Akers, there was no apparent defect with the ice machine or its cover. Tanner stated, "I believe visually [the cover] was attached appropriately," but "obviously . . . it was not."

Jim's owner, A.J. Stith, testified in his deposition that he last serviced the ice machine in July 2015, at which time he would have removed the front cover to clean the water system. Stith stated that to remove the front cover, he removes the lower exterior screw, lifts the cover off the mounting pins, and sets the cover aside. Stith stated that Jim's never removes the mounting pins when servicing the machine and that they would not be touched unless they were loose and needed to be tightened. To replace the front cover after cleaning the water system, Stith would lower it back onto the interior mounting pins and then replace the exterior lower attachment screw.

When asked about the likely appearance of the ice-machine front cover prior to the accident, Stith stated, "As far as looking up there hours before and saying—wondering if the ice-machine cover—that is not something somebody could look at and say, oh, that is going to be falling off here soon." When shown a video of the incident recorded by the restaurant

camera, Stith stated, "[A]ccording to this video, the cover looks fine until it doesn't—you know—until it falls."[4]   Stith testified that the exterior screw and interior mounting pin probably came loose over time due to the ice machine's vibration.  Stith also stated that this had never happened before during his ten years of maintaining numerous ice machines.

Christopher Akers stated in his deposition that on the day of the accident before the ice-machine front cover came loose, nothing appeared to be wrong with the ice machine. Akers stated that as far as he could tell, everything with the ice machine appeared normal. Akers stated that the first sign of anything being wrong was the cover falling and hitting him in the head.

In K-MAC's motion for summary judgment, it contended that based on these depositions there was no question that it did not have actual or constructive notice of a defect prior to the accident.  As such, K-MAC contended that it was not negligent and was entitled to judgment as a matter of law.

Akers filed a response to K-MAC's motion for summary judgment, asking that it be denied.  Akers contended that a genuine issue of material fact existed as to whether the dangerous condition of the ice-machine front cover was apparent or should have been apparent to K-MAC.  In support of its response, Akers submitted the affidavits of two expert professional engineers, Jason English and John Hamilton.

---

[4]This video recording is not in the record as it was not offered as evidence by either party, and the recording is evidently of poor quality.

6

In his investigation and analysis of the accident, Jason English used an exemplar ice machine and three ice-machine covers provided by K-MAC.[5] English gave the following opinions with respect to Jim's Refrigeration's negligence in causing the accident. English stated in his affidavit:

> 15. Given that one of the mounting pins was completely missing and the other was loose, it is my opinion that Jim's Refrigeration failed to install and tighten the nuts on the pin appropriately. In order for the mounting pins to loosen on their own due to potential vibration, Jim's Refrigeration failed to (a) ensure the locknut was installed in the correct direction with the lock washer between the nut and metal cabinet of the ice maker in order to engage between the mating surfaces to prevent such loosening, (b) failed to tighten the nut to the appropriate torque to engage the lockwasher, or (c) used a nut without a lock washer to install the mounting pin. If a pin, lockwasher, and nut was installed and torqued correctly, it is my opinion that vibration would not cause the nut to loosen, which is further evidenced by Mr. Stith's own testimony that he has never experienced this happening while maintaining numerous machines over a 10 year period since 2006, prior to this incident.
>
> 16. However, had the nut disengaged from the pin, it would have likely fallen and been contained within the interior of the cabinet, and the mounting pin portion likely would have been contained between the cabinet and front cover, or fallen on top of the ice dispenser unit on which the ice maker was sitting. Since neither the nut or the mounting pin was found after reasonable search shortly after the incident, this indicates that the mounting pin was likely not present the last time the front cover was installed. This condition would have been readily apparent to Jim's Refrigeration during their preventative maintenance service, and Jim's Refrigeration failed to properly install a replacement mounting pin. Further, Jim's Refrigeration failed to ensure both mounting pins were properly installed and appropriately tightened.
>
> 17. The previously described lower attachment screw was also found to be missing and also was not found after the incident. Accordingly, it appears that Jim's Refrigeration also failed to install this screw as the final step to install the cover in July 2015.

---

[5]For some reason that is not apparent from the record, the actual ice machine involved in the accident was not available for inspection.

18. The condition of the ice maker machine as described in this affidavit created an unreasonable risk of the front cover detaching from the machine, and given its mounted location overhead on top of the customer drink and ice dispenser machine and a likely high amount of pedestrian traffic at that location, created an unreasonably dangerous condition and risk of harm of the front cover detaching, falling, and impacting a customer below. Jim's Refrigeration failed to meet the standard of care for a contracted vendor responsible for installing and maintaining the ice maker machine in a safe condition, which ultimately resulted in the front cover falling and impacting Mr. Akers in the head.

Jason English also gave the following opinions with respect to K-MAC's negligence in causing the accident. English stated in his affidavit:

23. Since the actual ice maker machine was not identified and preserved for inspection,[6] an exemplar of the Manitowoc Model SY1474C ice maker was provided, along with three identical front covers, with the exception that one of the front covers was damaged. To recreate a similar condition as found on the date of the incident, the left mounting pin was removed in each cover installed. Following are side view photos of each of the three front covers installed with the missing mounting pin. As is visibly apparent in these photographs, there is a significant widening gap from bottom to top, which would have been visibly apparent during the above referenced numerous daily inspections of Taco Bell employees, cashiers, and managers-in-charge. Such condition should have reasonably alerted the staff of a potential issue with the securement of the front cover, particularly that the front cover is not properly secured, and further investigation and corrective action taken. Of note, the widening gap may have been even greater than shown in the following photos depending on the looseness the only remaining mounting pen, which was not loosened for the testing in this matter.[7]

---

[6]As noted in Akers' response to K-MAC's motion for summary judgment, Akers had sent a letter to K-MAC's insurance carrier with instructions to preserve the evidence relating to the accident. However, the actual ice machine involved in the accident was not provided to Akers' experts. K-MAC instead provided an ice machine that was the same model as the one involved in the accident.

[7]The photographs submitted with English's affidavit showed a gradually widening gap from the bottom to the top of the cover, with a maximum gap of about one and a half inches at the top.

8

24. Further, given that such cover was likely in this condition since July 2015, the front cover was likely wiped with a sanitary towel for cleaning at least on six occasions over the six-month time period prior to Mr. Akers' incident in January 2016, based on the testimony of Mr. Tanner that the ice maker front cover was likely cleaned once a month, maybe more. Testing was performed of a person wiping the front cover in the previously described condition, with the left mounting pin removed. Based on such testing, it would have been readily apparent to a person cleaning the front cover that the cover was loose, with it moving back and forth during cleaning, which should have reasonably alerted such employee that the cover was potentially inadequately secured, warranting further investigation and corrective action.

25. Given that such cleaning what have been likely performed from an elevated position on a stool or stepladder, it would also be visible that the bottom screw was likely missing, with such investigation further warranted given that the front cover was likely loose during cleaning.

26. Taco Bell is ultimately responsible for maintaining their premises in a safe condition for their customers, employees, and others reasonably anticipated to be present on their property, and knew or should have known the importance that the front cover in this matter be properly secured given its overhead location above the high traffic drink and ice dispenser machine. In this regard, Taco Bell failed to meet the standard of care of a reasonable premises owner/operator by failing to conduct reasonably thorough inspections, or otherwise respond to readily apparent indications that the cover was improperly secured, as discussed within this affidavit. Such failure caused an unreasonably dangerous condition to be present that exposed their customers and employees to an unreasonable risk of harm in the event the front cover detached and fell from his overhead location, which ultimately occurred to Mr. Akers.

Akers also submitted the affidavit of engineer John Hamilton. Hamilton stated that he examined exemplar equipment provided by K-MAC and Jim's Refrigeration. Hamilton stated that if the pin had just "vibrated out," it could have left evidence in the ice machine that is unavailable for examination, and therefore, that there was no physical evidence that the pin vibrated out. Hamilton stated that after examining the exemplar equipment and

9

reviewing the depositions of Tanner and Stith, it was his opinion that the cover struck Akers because the internal pin and external screw were missing. Hamilton stated further:

> [I]t is my opinion that A.J. Stith either removed the internal pin the last time he serviced the machine and failed to reinsert it, or he failed to notice that it was already missing and secured the cover without it, or failed to ensure that the pin and external screw were sufficiently tightened to avoid vibrating loose. This falls below the standard of care for someone charged with servicing the machine.

Akers relied on these expert opinions in opposing K-MAC's motion for summary judgment. Akers argued that given the evidence of the gapping, wobbling cover, and missing screw, whether the defective condition was known or should have been known by K-MAC was a question of fact for the jury.

On November 9, 2020, a hearing was held on the motions for summary judgment filed by K-MAC and Jim's respectively. On November 25, 2020, the trial court entered an order granting K-MAC's motion for summary judgment but denying Jim's motion for summary judgment. The findings and conclusions that the trial court made in denying Jim's motion for summary judgment are pertinent to our review of the granting of the motion for summary judgment in favor of K-MAC. In denying Jim's motion for summary judgment, the trial court concluded that the opinions of Akers' expert witnesses, English and Hamilton, could lead a reasonable mind to conclude that Jim's breached its duty of care and that the breach was a proximate cause of Akers' injury. In reaching this conclusion, the trial court relied in part on English's statement in his affidavit that "[s]ince neither the nut or the mounting pin was found after reasonable search shortly after the incident, this indicates the mounting pin was likely not present the last time [July 2015] the front cover was installed."

The trial court then stated: "[T]hese . . . do constitute enough evidence to meet the 'reasonable mind' standard to proceed to trial."

In deciding K-MAC's motion for summary judgment, the trial court stated that its analysis was focused on whether K-MAC knew or should have known about the defective condition of the ice-machine cover. In granting the motion, the trial court made these findings:

> The Plaintiff argues there is a question of fact as to whether K-MAC employees either knew or should have known of the defective condition of the ice machine based on three photographs contained in English's affidavit. Those photos show a significant gap between the cover of the ice machine and the machine itself. These photographs were a recreation of how the cover would appear with the left mounting pin removed.

> The court accepts the premise that the three photographs of the cover accurately portray how the cover would sit without the left pin in place. However, that condition would only be present once the pin was no longer in place. So, a reasonable approximation of when it fell out is key to the Plaintiff's ability to survive summary judgment because that evidence would tend to show K-MAC's knowledge of a defective condition, or that it should have possessed with such knowledge, which would then give rise to a duty to cure and/or warn of the possible danger.

> . . . .

> In this case, the Plaintiff bears the burden of proving how long the ice machine cover was in a visibly defective condition. Yet, there is no evidence before the court on that issue. In fact, the Plaintiff's own expert, English, opined in his affidavit that the mounting pins loosened due to vibration of the machine, and Jim's failure to properly secure the lock washer and nut. (par. 15 English Affidavit). Obviously, the loosening process would have occurred over time and not in an instant. The only evidence the court has to consider as to whether K-MAC knew or should have known the cover was or was not visibly defective is the testimony of Robert Tanner, manager of Taco Bell, and the plaintiff himself.

> Mr. Tanner stated in his affidavit that the drink station is part of the managers visual walkthrough inspection conducted several times each day. He added, "Prior to

11

the incident no defect was apparent with the ice machine and/or its cover despite the performance of the aforementioned daily inspections." (par. 6 Tanner Affidavit). In addition, the Plaintiff testified that when he went to fill his cup with ice he did not observe anything unusual or abnormal about how the cover appeared.

Even though English's affidavit states that during a test when the left pin was removed, the cover moved back and forth when wiped (par. 24 English Affidavit), not one employee of K-MAC has come forward to testify they experienced, or observed such condition to exist. In addition, no expert has plausibly opined at what point the defective condition became visible and apparent to K-MAC employees.

The court recognizes that English opined in paragraph 24 of his affidavit that the ice machine was "likely" showing a significant gap between the cover and the machine since July 2015. However, that is not an opinion requiring expertise in engineering. That is a conclusion based on pure speculation and it would be inadmissible at trial. *See Butler v. Arkansas State Highway Comm'n*, 6 Ark. App. 267, 640 S.W.2d 467 (1982), which held a court is not required to consider, "the opinion of an expert when it clearly appears that it is opposed to physical facts, common knowledge, the dictates of common sense or is pure speculation." Citing *Easton v. H. Boker & Co.*, 226 Ark. 687, 292 S.W.2d 257 (1956). In addition, facts stated in an affidavit must be admissible in evidence if they are to be relied upon in granting or denying summary judgment. *Dixie Ins. Co. v. Joe Works Chevrolet, Inc.*, 298 Ark. 106, 766 S.W.3d 4 (1989).

*Since there is no evidence before the court as to the length of time that cover may have appeared to be in a defective condition,* the court finds that K-MAC has met its burden of showing that no reasonable mind could conclude that it knew, or should have known of its existence, therefore, it is entitled to judgment as a matter of law.

(Emphasis added.)

On December 7, 2020, Akers filed a motion for reconsideration[8] or, alternatively, for certification of the judgment under Arkansas Rule of Civil Procedure 54(b). On December 30, 2020, the trial court entered an order denying both K-MAC's and Jim's motions for

---

[8]Jim's also filed a motion for reconsideration.

reconsideration but granting K-MAC's motion for a Rule 54(b) certificate. Also on December 30, 2020, the trial court entered an amended order, again granting K-MAC's summary-judgment motion and denying Jim's summary-judgment motion, and this order included a Rule 54(b) certificate. In the Rule 54(b) certificate, the trial court set forth specific factual findings as to why there was no just reason to delay entry of a final judgment. In particular, the trial court found that a compelling and discernible hardship—two trials with the same facts—would be avoided by allowing an appeal at this intermediate stage.[9] On January 5, 2021, Akers timely filed a notice of appeal from the summary judgment entered in favor of K-MAC.

On appeal, Akers argues that summary judgment should not have been entered because there was a material issue of fact as to whether K-MAC knew or should have known about the defective condition of the cover prior to the accident. Intertwined in this argument is Akers' contention that the trial court erred in failing to consider English's opinion as expressed in his affidavit, which would have precluded summary judgment. We agree that summary judgment was erroneously entered for K-MAC.

## II. *Standard of Review*

Our supreme court has set forth the standard of review for summary-judgment cases as follows:

> Summary judgment should only be granted when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as

---

[9]We conclude that trial court's certificate was executed in compliance with the requirements of Rule 54(b), thus conferring jurisdiction of this appeal.

a matter of law. The purpose of summary judgment is not to try the issues, but to determine whether there are any issues to be tried. We no longer refer to summary judgment as a drastic remedy and now simply regard it as one of the tools in a trial court's efficiency arsenal. Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. We view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties.

*Harvest Rice, Inc. v. Fritz & Mertice Lehman Elevator & Dryer, Inc.*, 365 Ark. 573, 575–76, 231 S.W.3d 720, 723 (2006) (internal citations omitted).

III. *Discussion and Analysis*

It is undisputed that Akers was a business invitee of K-MAC. The law is quite settled that a property owner has a general duty to exercise ordinary care to maintain the premises in a reasonably safe condition for the benefit of invitees. *Morehart v. Dillard Dep't Stores*, 322 Ark. 290, 908 S.W.2d 331 (1995). To recover for the failure of a possessor of property to use ordinary care, the business invitee has to show (1) that the premises were defective; (2) that the possessor created the defect or that the defect was apparent or, by the exercise of ordinary care, should have been apparent so that a reasonably prudent possessor would correct the defect or warn the invitee of it; and (3) that the defect caused the injury. *Crenshaw v. Ark. Warehouse, Inc.*, 2010 Ark. App. 612, 379 S.W.3d 515. It is not disputed that the front cover to the ice machine was in a defective condition and that the defect caused Akers' injury. It is further undisputed that K-MAC did not create the defect. The issue here, then,

14

is whether the defect was apparent to K-MAC or by the exercise of ordinary care should have been apparent so that a reasonably prudent possessor would correct the defect or warn the invitee of it.

In this appeal, Akers argues that, based on the affidavits of his experts, there was a fact question as to whether the ice machine's defective front cover was, or should have been, apparent to K-MAC. Although Akers did not himself notice any defect when he was filling his cup with ice that day, and Tanner testified that no defect was apparent to him or had been reported by K-MAC's employees, Akers submits that his experts presented sufficient proof that a defect would or should have been apparent to K-MAC's employees prior to the accident, and yet no measures were taken by K-MAC to prevent the accident.

Akers notes that when engineer English conducted a test that recreated the appearance of the ice-machine cover without the left mounting pin present, there was a significant widening gap from the bottom to the top of the cover that would have been visibly apparent. One photograph taken by English during his investigation and testing depicted a gap between the left side of the frame of the ice machine and the top of the left side of the front panel measuring approximately one and a half inches. Significantly, in ruling on the motion for summary judgment, the trial court did not reject English's opinion nor disagree with the accuracy of the gap depicted in the photographs; it instead expressly *accepted the premise* that the three photographs of the cover—showing the gap—accurately portrayed how the cover would sit without the left pin in place. The trial court, however, then found that there was no evidence as to how long the cover was in this visibly defective condition. In

15

making this finding, the trial court noted English's opinion that this gap was likely apparent since July 2015 when Jim's last serviced the ice machine, but then dismissed this opinion based on the trial court's conclusion that the opinion was based on "pure speculation." Akers contends that this was an error.

The admission of expert testimony is reviewed under an abuse-of-discretion standard. *Tiarks v. State*, 2021 Ark. App. 325, 633 S.W.3d 788. Akers contends that the trial court abused its discretion in concluding that English's opinion about the likely duration of the gap would be inadmissible at trial and in disregarding this opinion. Akers argues that this opinion was not based on "pure speculation" as found by the trial court but was, instead, based on facts. In particular, Akers asserts that English's opinion was based on the undisputed fact that when Stith came to repair the front cover of the ice machine, Stith looked both inside and outside the ice machine for the missing interior left mounting pin but did not find it. Furthermore, English relied on the fact that in ten years of servicing ice machines, Stith had never seen this happen before. English stated that, based on his observation of the ice machine and front cover, "had the nut disengaged from the pin, it would have likely fallen and been contained within the interior of the cabinet, and the mounting pin portion likely would have been contained between the cabinet and front cover, or fallen on top of the ice dispenser unit on which the ice maker was sitting." As a result of these facts and observations, English concluded that "[s]ince neither the nut or the mounting pin was found after reasonable search shortly after the incident, this indicates that the mounting pin was likely not present the last time the front cover was installed." And this

16

leads to English's conclusion that the front cover was likely in this defective condition, where the gap would have been noticeable and the cover unsteady when cleaned, for a period of about six months since Stith last serviced the ice machine in July 2015.

Akers asserts that English's opinion was consistent with the opinion of his other expert, Hamilton. Hamilton stated in his affidavit that "[i]f the pin had just 'vibrated out' it could have left evidence in the incident ice machine which is unavailable for examination. Therefore, there is no physical evidence that the pin vibrated out." Akers states that not only was the left mounting pin never located despite Stith's inspection of the interior of the ice machine, but the actual ice machine at issue was never provided by K-MAC for inspection despite Akers' request.[10]

Based on the proof submitted by Akers, he argues that a fact question was created as to when the defect to the front cover of the ice machine became, or should have become, apparent to K-MAC. Akers argues that the fact that the left mounting pin was never located would permit a jury to find that it had been missing for an extended period of time dating back to when the front cover was last removed by Stith during his July 2015 maintenance of the machine.

We agree with Akers' argument that a material fact question was presented such that summary judgment should not have been entered. As an initial matter, we agree that the

---

[10]Akers cites *Bunn Builders, Inc. v. Womack*, 2011 Ark. 231, and AMI Civil 106 for the proposition that because K-MAC failed to preserve and produce the ice machine, an inference may be drawn that an examination of the ice machine would have been unfavorable to K-MAC.

trial court abused its discretion in disregarding English's opinion that the front cover to the ice machine was likely missing the left interior mounting pin since being serviced by Jim's in July 2015. The trial court excluded this opinion based on its finding that the court is not required to consider the opinion of an expert "when it clearly appears that it is opposed to physical facts, common knowledge, the dictates of common sense or is pure speculation," and that English's opinion was based on "pure speculation." We cannot agree with the trial court's characterization of English's opinion as "pure speculation" because it was premised on factual observations, most notably that the left interior mounting pin was never found after the front cover came loose and fell and that the interior mounting pin, had it been present and then vibrated loose, likely would have fallen inside the machine. It is not unimportant that in denying Jim's simultaneous motion for summary judgment, the trial court appeared to consider and accept the very same opinion by English that it refused to consider in the K-MAC motion for summary judgment. In denying Jim's summary-judgment motion, the trial court quoted English's opinion that "[s]ince neither the nut or the mounting pin was found after reasonable search shortly after the incident, this indicates that the mounting pin was likely not present the last time the front cover was installed," and then concluded, "Jim's may not agree with these opinions, and the weight they should be given is a matter to determine at a later date, but they do constitute enough evidence to meet the 'reasonable mind' standard to proceed to trial." We hold that English's opinion in this regard should not have been disregarded by the trial court in deciding K-MAC's summary-

judgment motion, and further that the motion should have been denied based on the existence of a material fact question.

In arguing that the summary judgment should be affirmed, K-MAC analogizes this case to *Gann v. Parker*, 315 Ark. 107, 865 S.W.2d 282 (1993). However, *Gann* is readily distinguishable. *Gann* involved a home with a possible natural-gas leak. The homeowners hired a repairman to investigate for leaks, and the repairman's investigation discovered a leak in the stove. While attempting to seal the leak, the repairman came in contact with a cabinet-mounted range hood and sustained an electrical shock. The repairman asserted a negligence claim against the homeowners, and the trial court granted summary judgment for the homeowners. On appeal, the supreme court in *Gann* affirmed the summary judgment, holding that there was no genuine issue of material fact regarding the homeowners' lack of negligence in failing to cure a defect inside an appliance or failing to warn the invitee, the repairman, of the defect. In affirming, the *Gann* court noted that the defect inside the appliance was simply not apparent to the homeowners, and that there was no showing that by the use of ordinary care a reasonably prudent possessor would have discovered the defect inside the appliance. *Gann*, however, differs from the present case because that case involved a defective condition that was clearly hidden, whereas, in this case, there was competing evidence as to whether the defect should reasonably have been apparent to K-MAC.

We think the present case is more like *Little v. Jonesboro Country Club*, 92 Ark. App. 214, 212 S.W.3d 57 (2005). In *Little*, the plaintiff sued a golf club alleging that she fell into an uncovered and hidden valve hole located off the sixteenth-hole fairway. The trial court

19

granted summary judgment to the golf club, but our court reversed. In reversing the summary judgment, we wrote:

> In the case at bar, there is a genuine issue of material fact as to whether the club, with ordinary care, should have discovered that the valve cover was defective or missing. The Littles offered evidence to show that the valve hole into which Mrs. Little fell was not visible at the time of her injury, that it was covered by thick grass, and that it was supposed to be capped but was not. On the other hand, the club's golf course superintendent stated that the area was mowed approximately four days before the incident; that the entire course was frequently inspected for potential hazards; that prior to Mrs. Little's fall, he had never received information concerning a cracked valve cover or observed one anywhere on the course; and that he had inspected most of the course on the morning of May 29, 2000. It is also clear from the evidence, however, that the irrigation system had been in place since 1983 and that the valve covers required periodic maintenance and attention. Whether the club's inspection and maintenance procedures were adequate in this case presents an issue of material fact for the trier-of-fact.

*Little*, 92 Ark. App. at 217–18, 212 S.W.3d at 59–60.

Similarly, we conclude in the case at bar that there is an issue of material fact for the trier-of-fact. K-MAC's manager, Robert Tanner, stated in his sworn testimony that the drink station is part of the managers' visual walkthrough inspection conducted several times each day. Moreover, a manager walk is performed approximately every thirty minutes, which includes a visual inspection of the dining room, including the beverage-dispenser station, for apparent defects. In addition, K-MAC performs a food-safety-checklist inspection twice a day at approximately 11:00 a.m. and 5:00 p.m., which includes visual inspection of the dining room for apparent defects. Tanner stated further that K-MAC employees clean the soda-dispenser nozzles nightly and regularly cleaned the front of the ice machine once a month, maybe more, which included wiping down the front of the ice machine with a

20

sanitized towel. Despite these regular inspections and cleaning of the drink dispenser and ice machine, Tanner stated there was no visible sign that the ice-machine cover was loose prior to the time of the accident.

Expert witness for the appellant, engineer Jason English, however, offered a different opinion. English stated

"Had the nut disengaged from the pin, it would have likely fallen and been contained within the cover of the cabinet, and the mounting pin portion likely would have been contained between the cabinet and front cover or fallen on top of the ice dispenser unit on which the ice maker was sitting. Since neither the nut or the mounting pin was found after reasonable search shortly after the incident, *this indicates that the mounting pin was likely not present the last time the front cover was installed* [*by Jim's in July 2015*]."[11]

(Emphasis added.) English further produced photographs of the cover of the exemplar ice machine with the left pin missing, which showed a noticeable gap between the cover and ice machine. According to English, the gap would have been noticeable to K-MAC during the months leading up to the accident. English opined that based on his testing and the testimony of Mr. Tanner, the gap between the front cover and the ice machine would have been readily apparent to a person cleaning the front cover. The front cover was loose and would have moved back and forth during cleaning, which should have reasonably alerted

---

[11]K-MAC argues that English offered alternate theories that either the left mounting pin was missing in July 2015 or that it came loose sometime thereafter. However, we think a fair reading of English's affidavit is that the *right pin* eventually came loose due to inadequate torquing of that pin, but that the *left pin* was likely missing when Jim's serviced the ice machine in July 2015.

21

such employee that the front cover was potentially inadequately secured, warranting further investigation and corrective action.

Whether K-MAC knew or should have known of the defective condition of the top cover of the ice machine prior to Akers' accident is an issue not suited for summary judgment but rather is an issue for a jury. Accordingly, we reverse the trial court's grant of summary judgment in favor of K-MAC and remand for further proceedings.

Reversed and remanded.

WHITEAKER and MURPHY, JJ., agree.

*McCutchen Sexton Napurano*, by: *Joey McCutchen*, *Sam Sexton III*, and *Stephen Napurano*, for appellant.

*Donna Law Firm, P.C.*, by: *Scott D. Festin*, pro hac vice; and *Friday, Eldredge & Clark LLP*, by: *Martin A. Kasten*, for appellee.